UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TREVIS RAGSDALE,

                                        Plaintiff,

                                                          Case # 21-CV-6188-FPG
v.                                                        DECISION AND ORDER

CONFER, MCCORMICK, MASOCCO,
MCCARICK, STANTON, COURTWRIGHT,
and LEPKOWSKI,

                                        Defendants.

## INTRODUCTION

*Pro se* Plaintiff, Trevis Ragsdale, an inmate currently incarcerated at the Clinton Correctional Facility filed this action seeking relief under 42 U.S.C. § 1983. ECF No. 1. After an initial screening of the Complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a), Plaintiff filed an amended complaint ("Amended Complaint") alleging that, during his previous incarcerations at the Five Points Correctional Facility ("Five Points") and Southport Correctional Facility ("Southport"), Defendants violated his rights when they used excessive force against him, and then denied him proper medical care and due process, as more particularly set forth in the Amended Complaint. ECF Nos. 3, 6. Defendants now move for summary judgment on all of Plaintiff's claims. ECF No. 45. As explained below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

On January 30, 2020, Plaintiff was involved in a fight with another inmate ("Barber") in or near the kitchen at Five Points. ECF No. 6 at 13. Defendants Confer and McCarick sprayed Plaintiff with chemicals, placed him in mechanical restraints, and then moved him to the B-side mess hall. *Id.* While there, Plaintiff alleges that Defendants Confer and McCarick assaulted him

1

while Defendants Masocco and Mathewson watched. *Id.* at 7. Defendants do not dispute this allegation. ECF No. 45-1 at ¶ 3. After the alleged assault, Plaintiff was taken to the medical unit where he claims to have been beaten a second time. *Id.* at 8, 15-17. As a result of the alleged assault, Plaintiff claims that he suffered a concussion, bruised ribs, "broken cartilage in [his] right shoulder," nerve damage in his hands, sore ribs, a swollen eye, and that he "burned all night" from the chemical spray. *Id.* at 15. Plaintiff complains that, while he was in the medical unit, and later the Special Housing Unit ("SHU"), Defendant Stanton refused to provide medical assistance, and that all Defendants prevented him from washing the chemical agent off of his skin. *Id.* at 9. Defendants do not dispute these allegations either. ECF No. 45-1 at ¶ 6-8.

Later, Plaintiff was issued a misbehavior report for the fight with Barber charging him with violent conduct, creating a disturbance, fighting, and refusing a direct order. ECF No. 45-1, Ex. A. A disciplinary hearing to determine whether Plaintiff was guilty of the charges was held on February 5, 2020 and presided over by Defendant Courtwright. *Id.*, Ex. B. At the hearing, Defendant Courtwright denied Plaintiff access to certain evidence and after a verbal altercation between Defendant Courtwright and Plaintiff, Plaintiff was removed from the hearing. *Id.* at 410-411. Defendant Courtwright finished the hearing in Plaintiff's absence, finding him guilty of all charges, and imposed a penalty of 120 days in SHU, 270 days without recreation, packages, commissary, phone and tablet, and 6 months loss of good time. *Id.* at 411-414. On April 22, 2020, this decisionwas reversed for failure to advise Plaintiff of the consequences of being removed from the hearing. *Id.*, Ex. F at 259.

Plaintiff's second disciplinary hearing began on May 5, 2020 and was presided over by Defendant Lepkowski. *Id.*, Ex. E. Plaintiff pled "guilty" to fighting and violent conduct, and "not guilty" to creating a disturbance and refusing a direct order. *Id.* at 11. However, because Plaintiff's

hearing assistant did not provide Plaintiff with evidence that he requested for his defense, the hearing officer adjourned the hearing, promising to submit his requests to Five Points himself. *Id.* at 9-18. Plaintiff requested the Use of Force Report, the Unusual Incident Report, his medical records, video tape of the B-side mess hall starting at 1:50pm and ending at 2:50pm, certain witnesses, including Barber and the officers responding to the fight in the kitchen, photos of his injuries, and "all paperwork pertaining to [the] incident." *Id.* at 9-15. When the hearing was reconvened on May 14, 2020, Plaintiff changed his plea to "not guilty" on the charge of violent conduct. *Id.* at 19-20. Although Plaintiff obtained some of the evidence that he requested, he complained that he did not get everything saying, "I have no medical reports…I have no pictures…I have nothing." *Id.* at 25. Defendant Lepkowski had photos and permitted Plaintiff to view the photos at the hearing. *Id.* at 26-27. Plaintiff also wanted statements from the corrections officers but there were none to provide. *Id.* Plaintiff also indicated that he wanted to call other inmates that witnessed the fight as witnesses in the hearing. *Id.* at 31. He also did not get the video that he requested. *Id.* at 40-42. The hearing was adjourned again to permit a second attempt to obtain the video tape evidence Plaintiff requested. *Id.* at 65. Plaintiff's hearing was reconvened for the last time on May 20, 2020. *Id.* at 67-87. During the final day of the hearing, Plaintiff interviewed Barber, but was denied the opportunity to interview other witnesses, and complained that he did not have the documents he requested or the correct video footage. After Plaintiff's continued objections, Defendant Lepkowski removed Plaintiff from the hearing and completed the hearing in his absence, finding him guilty of all charges, and imposing the same penalty imposed at the first hearing with credit for time served. *Id.* 82-88. The second hearing was also reversed on July 2, 2020 after Plaintiff's appeal. *Id.*, Ex. F.

**LEGAL STANDARD**

3

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment" if the moving party "shows that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  "Where the moving party demonstrates 'the absence of a genuine issue of material fact,'" *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Celotex Corp.*, 477 U.S. at 323), "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (1986) (emphasis in original).  "Only disputes over facts that might affect the outcome of the suit under the governing law" are "material." *Id.* at 248.  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In deciding a motion for summary judgment, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Angulo v. Nassau Cnty.*, 89 F. Supp. 3d 541, 548 (E.D.N.Y. 2015) (quoting another source). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).  Indeed, "[i]f, as to the

4

issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc*., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. *Anderson*, 477 U.S. at 252.  A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986); *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading....").

## DISCUSSION

Plaintiff asserts a Fourteenth Amendment procedural due process claim based on two disciplinary hearings during which he alleges that he did not receive sufficient process. He also brings claims of excessive force, deliberate indifference, and failure to intervene. Defendants argue that they are entitled to summary judgment on Plaintiff's due process claim because Plaintiff has failed to show that he was deprived of a cognizable liberty interest and otherwise received sufficient process. Defendants further argue that they are entitled to summary judgment with respect to Plaintiff's remaining claims because he failed to exhaust available administrative remedies within the prison system.

First, the Court need not discuss Plaintiff's contention that his rights were violated at the first hearing because it became a "nullity" after the second hearing was held, crediting the penalty from the first hearing. *See Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998), *adhered to on reh'g*,

178 F.3d 603 (2d Cir. 1999), *amended*, 191 F.3d 244 (2d Cir. 1999). All findings and penalties imposed at the first hearing were vacated, and all the penalties Plaintiff suffered were imposed at the second hearing, giving credit to the penalty served by the first hearing. *See id.*; *See also Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (stating that plaintiff's confinement in SHU was "entirely attributable to the ruling following the second hearing, given that the result of the first hearing was administratively overruled and that [Plaintiff's] sentence following the second hearing credited his prior time in SHU. Accordingly, the result of the first hearing did not deprive Plaintiff of due process."). Accordingly, the Court will only consider Plaintiff's due process claim as it relates to the second hearing.

Second, although Defendants do not raise it, the Court wishes to make clear that the issue of exhaustion with respect to Plaintiff's due process claims is also satisfied. The Prison Litigation Reform Act ("PLRA"), provides that "[n]o action shall be brought with respect to prison conditions under [§ 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has stated that the phrase "prison conditions" in the PLRA refers to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong," which includes claims that an administrative hearing was not properly conducted. *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Under New York's Inmate Grievance Program regulations, the process involved in an administrative hearing is deemed non-grievable, and so, the only administrative remedy for challenging an administrative hearing is an appeal of the hearing. Therefore, the Second Circuit has held that a "prisoner may exhaust their administrative remedies for segregated confinement by appealing the adverse hearing determination." *Davis v. Barrett,* 576 F.3d 129, 132 (2d Cir. 2009) (citing *Ortiz v. McBride*, 380

6

F.3d 649, 653–54 (2d Cir. 2004)). Here, Plaintiff appealed both hearing decisions and obtained reversals of those hearing within the administrative process. Thus, this Court finds that Plaintiff's administrative appeals were sufficient for purposes of PLRA exhaustion.

## I.   Due Process

To prevail on a procedural due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (citation omitted). Defendants move for summary judgment on Plaintiff's procedural due process claims, arguing that he (1) cannot establish that he was deprived of a protected liberty interest and (2) otherwise received all the process he was due. The Court finds that Plaintiff has shown that he was deprived of a cognizable liberty interest and that Defendants have failed to show the absence of a genuine dispute of material fact regarding the process Plaintiff received.

### A.   Liberty Interest

At issue is whether the penalty imposed on Plaintiff as a result of the second disciplinary hearing deprived him of a recognized liberty interest under the Fourteen Amendment. In *Sandin v. Conner*, the Supreme Court made clear that the Due Process Clause does not recognize the liberty interests of an incarcerated person unless the restraint imposed on such person is an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

After finding Plaintiff guilty of the misconduct alleged, Defendant Courtwright imposed a penalty of 120 days in SHU, 270 days without recreation, packages, commissary, phone and tablet, and 6 months loss of good time. ECF No. 45-1, Ex. A at 411-414. Even though the hearing was reversed, Defendant Lepkowski imposed the same penalty on Plaintiff after finding him guilty

again at the second hearing and credited the penalty already served under the first hearing. ECF No. 45-1, Ex. E at 84-85.

Defendants argue that the penalty did not deprive Plaintiff of a cognizable liberty interest because 120 days in SHU is not an atypical and significant hardship. ECF No. 45-3 at 3-5. Plaintiff, on the other hand, argues that the penalty of 120 days in SHU was atypical and significant hardship because it was exacerbated by the lack of sufficient medical care for an extended period of time. ECF No. 6 at 16.

SHU confinement alone, of any duration, is an extremely harsh punishment and has been rightfully described as "too severe," *In re Medley*, 134 U.S. 160, 168, (1890), "press[ing] the outer bounds of what most humans can psychologically tolerate." *Madrid v. Gomez*, 889 F. Supp. 1146, 1267 (N.D. Cal. 1995). In his testimony before the Senate Judiciary committee, Professor Haney, who has been studying the psychological effects of solitary confinement for more than 30 years, indicates that nearly "45% of solitary confinement prisoners are [] afflicted" with "psychological impairments," and that for many of those so afflicted, the "signs and symptoms of mental illness appear to have emerged only *after* the prisoner's term in solitary confinement began." *Reassessing Solitary Confinement: The Human Rights, Fiscal and Public Safety Consequences: Hearing before the Subcommittee on the Constitution, Civil Rights and Human Rights of the Senate Judiciary Committee*, 112th Cong. 78-79 (2012) (Testimony of Craig Haney, PhD., Professor of Psychology University of California, Santa Cruz) (emphasis in original). Professor Haney explains that the psychological and psychiatric maladies inflicted upon incarcerated individuals as result of their time in SHU can range from "significantly increased negative attitude and affect, irritability, anger, aggression and even rage" to "deep depression . . . and psychosis, including visual and auditory hallucinations." *Id.* at 81-82. For those fortunate inmates who avoid the worst of the foregoing

psychological consequences, "the absence of regular, normal interpersonal contact and any semblance of a meaningful social context" can still create "a pervasive sense of unreality." *Id.* at 83. In light of the foregoing, it is no surprise that "approximately 50% of all prison suicides occur in solitary confinement." *Id.* at 79.

Despite its evident harshness and harrowing consequences, the Supreme Court has held that SHU confinement alone "does not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Sandin*, 515 U.S. at 486. Rather, to establish a liberty interest, an incarcerated individual must demonstrate that the SHU confinement "exceeded similar, but totally discretionary, confinement in either duration or degree of restriction." *Id.* Respecting duration, lower courts have consistently refused to recognize the liberty interests of incarcerated individuals for SHU confinements lasting as long as, or even longer than, 180 days. *See e.g.*, *Spence v. Senkowski*, No. 91-CV-955, 1998 WL 214719, at *1 (N.D.N.Y. Apr. 17, 1998) (180 days in SHU not considered an atypical or significant hardship); *Carter v. Carriero*, 905 F. Supp. 99, 104 (W.D.N.Y. 1995) (270 days in SHU not considered an atypical or significant hardship); *Husbands v. McClellan*, No. 93–CV–6025L, 1998 WL 24232, at *2 (W.D.N.Y. Jan.13, 1998) (180 days in SHU not an atypical or significant hardship). Here, the duration of Plaintiff's SHU confinement—120 days—falls well within the usual limits that escape Due Process protection. However, Plaintiff alleges something more.

Plaintiff argues that his SHU confinement was "atypical and significant" because, during the first twenty-one days of that confinement, he was denied adequate healthcare. In other words, the conditions of his SHU confinement "exceeded . . . [the] degree of restriction" of other SHU confinements. *Sandin*, 515 U.S. at 486. Defendant opposes Plaintiff's position by summarily

stating that "Plaintiff cannot show he was subject to confinement posing an 'atypical and significant hardship' based on the conditions of his confinement." ECF No. 45-3 at 12.

Plaintiff submits as evidence the series of sick calls that he issued to medical staff at Five Points during those initial twenty-one days. ECF No. 50 at 21-24. On February 3, 2020, Plaintiff's medical records show that the nurses acknowledged an awareness of Plaintiff's pain and prescribed him four doses of Tylenol. ECF No. 45-1, Ex. G at 426. However, according to the sick call Plaintiff submitted on February 5, 2020, "[his] head won't stop hurting, [his] ribs hurt, [his] shoulder and hands hurt." ECF No. 50 at 21. Again, on February 6, 2020, he complained that "[he's] been in pain, [his] head hurts, [his] ribs hurt, [his] hands hurt [his] lower back hurts." *Id.* at 22. Although the nurses again prescribed him ibuprofen on February 7, 2020, ECF No. 45-1, Ex. G at 450, Plaintiff continued complaining on February 11, 2020 that "[he's] in pain" and that he would like someone "to look at [his] wrists, [his] shoulder, [his] ribs." ECF No. 50 at 23. He begged for and was denied an x-ray. ECF No. 50 at 33-36. He explains further that no one "even look at [his] wrists." *Id.* On February 15, 2020, Plaintiff continued complaining that "[his] wrists, [his] shoulder and [his] ribs and lower back should not still be hurting and [he's] still got this pain in [his] head." ECF No. 50 at 24. A nurse visited again on February 17, 2020, but nothing was prescribed for his pain. ECF No. 45-1, Ex. G at 449.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable factfinder could conclude from these continued complaints of unrelenting, and largely unaddressed, pain that the conditions of Plaintiff's first twenty-one days in SHU constituted an atypical and significant hardship. *See Martinaj v. Uhler*, No. 918CV257, 2023 WL 2984449, at *14 (N.D.N.Y. Mar. 13, 2023). Accordingly, Plaintiff has shown that there is a triable issue of fact regarding the deprivation of a liberty interest.

### B. Process Due

An incarcerated person placed in administrative segregation must be provided: (1) advanced written notice of the charges against him at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, call witnesses, and present rebuttal evidence; and (3) a written statement as to the evidence relied upon and the reasons for the disciplinary action taken. *See Wolff v. McDonnell*, 418 U.S. 539, 564-66 (1974). An incarcerated person is also entitled to a hearing officer who is "fair and impartial." *McCann v. Coughlin*, 698 F.2d 112, 122 (2d Cir. 1983).

Plaintiff asserts that his due process rights were violated because (1) he was removed from his disciplinary hearing without cause, (2) he was not provided adequate employee assistance, (3) Defendant Lepkowski was not an impartial hearing officer, and (4) he was denied access to certain witnesses and documentary evidence. Defendants argue that they are entitled to summary judgment on each of these claims for various reasons and that even if any of the foregoing procedural deficiencies rise to the level of a due process violation, Plaintiff did not suffer any prejudice. The Court will address each due process claim in turn.

### 1. Appearance at Hearing

"The Due Process Clause provides inmates with several protective procedures that they may expect at disciplinary hearings, including the opportunity to appear at the hearing." *Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir.1992) (*citing Freeman v. Rideout*, 808 F.2d 949, 953 (2d Cir. 1986); *Wolff*, 418 U.S. at 564–66). "These procedures, of course, must in certain circumstances give way to institutional safety or correctional goals." *Freeman*, 808 F.2d at 953-54. For example, "[W]here an inmate disrupts a hearing, a hearing officer has discretion to order the inmate removed, particularly if the prisoner has been warned that continued unruly behavior

11

may result in his expulsion." *Clark v. Dannheim*, No. 02-CV-6525L, 2011 WL 2973687, at \*1 (W.D.N.Y. July 21, 2011).

Here, Defendants argue that plaintiff was properly removed from the hearing after he became disruptive and failed to comply with Defendant Lepkowski's repeated instructions. ECF No. 45-3 at 16-17. Plaintiff argues, however, that he was not disruptive, but rather that Defendant Lepkowski was bothered by Plaintiff's pointed criticism of the inconsistent positions Defendant Lepkowski took with respect to the evidence Plaintiff requested over the course of the several days the hearing took place. ECF No. 6 at 10.

The Court has reviewed the portion of the hearing transcript leading up to Plaintiff's removal. It starts with Plaintiff requesting additional witnesses, a request that Defendant Lepkowski denied, and ends with Plaintiff requesting certain video and documentary evidence that Defendant Lepkowski also refused to provide Plaintiff. ECF No. 45-1, Ex. E, at 72-82. Although, there is a moment where Lepkowski tells Plaintiff "you need to stop yelling," Plaintiff responds "I'm not yelling, I'm speaking." *Id.* at 75. After this moment, Plaintiff and Defendant Lepkowski are able to proceed with a productive conversation where Plaintiff continued requesting other evidence that Defendant Lepkowski refused to provide. Plaintiff explains his shock at another moment by stating "I don't understand how from last week, we was alright. You was tellin me this an tellin me that." *Id.* at 75. The context of this statement suggests that Plaintiff is here referring to Defendant Lepkowski's prior indications that he would get certain video evidence for Plaintiff. *Id.* at 47. Although he expressed some frustration with Defendant Lepkowski's unexplained change of position, Plaintiff collected himself and proceeded with his request for certain documentary evidence that Defendant Lepkowski had previously told him he would obtain. Defendant Lepkowski denied that request as well, stating "you're trying to go a whole different

way with this." *Id.* at 82. Plaintiff responds "I ain't trying to go a whole different nothin, I don't know what I'm trying to do." *Id.* Defendant Lepkowski then responds, "We're done." Plaintiff objects, and Defendant Lepkowski insists "no, we're done, goodbye, take him out." *Id.*

Viewing this evidence in the light most favorable to Plaintiff, there is evidence to support Plaintiff's version of events which is that he was removed not because he disrupted the hearing, but because Defendant Lepkowski was annoyed with Plaintiff's pointed questioning and criticism. Therefore, there is a genuine dispute as to the reason supporting Plaintiff's removal from the hearing. Defendant Lepkowski's reason for removing Plaintiff from the hearing is material to the question of whether his removal violated his right to procedural due process under the circumstances. Accordingly, Defendants are not entitled to summary judgment on Plaintiff's due process claim arising out of his removal from the hearing.

### 2. Employee Assistance

In the fifth enumerated claim in the Amended Complaint, Plaintiff discusses how the employee assistant he selected for his second disciplinary hearing never interviewed witnesses or collected documents that he requested. ECF No. 6 at 10. Defendants do not directly address this issue in their motion papers, however, to the extent Plaintiff alleges a due process violation based on inadequate employee assistance arising out of these facts, Defendants are entitled to summary judgment.

The state has a "clear constitutional obligation, pursuant to the Due Process Clause of the Fourteenth Amendment, to provide assistance to an inmate 'in marshaling evidence and presenting a defense when he is faced with disciplinary charges.'" *Pilgrim v. Luther*, No. 01-CV-8995RCCKNF, 2007 WL 233203, *4 (S.D.N.Y. January 24, 2007) (*quoting Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir.1988)). Where, as here, an inmate is already confined to SHU, the obligation

to provide assistance is greater as the inmates' ability to prepare a defense is reduced. *Id.* "[A]n assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself." *Eng v. Coughlin*, 858 F.2d 889, 898 (2d Cir.1988). "The assistant is not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel in a prison disciplinary proceeding," *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir.1993), but "the assistance must be provided in good faith and in the best interests of the inmate." *Eng*, 858 F.2d at 898. "[A]n assigned assistant who does nothing to assist a disabled prisoner—one who is segregated from the general prison population—has failed to accord the prisoner his limited constitutional due process right of assistance." *Id.*

Here, Plaintiff has alleged that his employee assistant did not provide any assistance whatsoever. ECF No. 6 at 10. The transcript of the hearing provides some support for this claim. Specifically, on the first day of the hearing, the hearing officer notes that he has paperwork showing that the Plaintiff picked an employee assistant, but that he could not find paperwork to show that he was actually assisted. ECF No. 45-1, Ex. E at 4. Plaintiff agrees and explains that the employee assistant never did anything to help with interviewing witnesses or finding documents. *Id.* Based on the absence of paperwork showing that he had been assisted and Plaintiff statements on the record, the hearing officer concluded that Plaintiff "ha[d] not been properly assisted." *Id.* at 9.

Although the evidence shows that there is no dispute that Plaintiff's employee assistant did not actually assist him, Plaintiff would need to show that he was prejudiced by the procedural error in order for this claim to survive summary judgment. *See Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) (Explaining that it is "entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate

14

assessment as to whether the error was harmless or prejudicial."). Plaintiff cannot show that this error prejudiced the outcome of the disciplinary hearing.

Once the hearing officer determined that Plaintiff was not properly assisted, the hearing officer adjourned the hearing and himself took steps to help Plaintiff obtain the documents and witnesses he requested. *See* ECF No. 45-1, Ex. E at 9 ("We are going to stop . . . so I can find out what happened with the paperwork. I'm going to have you give me another list of what you asked the tier assistant for."). Therefore, the inadequate assistance from the employee assistant cannot be said to have caused prejudice to Plaintiff because of the intervening actions that that hearing officer undertook subsequent to the employee assistant's failures. Accordingly, Defendants are entitled to summary judgment as to whether the allegedly inadequate employee assistance violated Plaintiff's due process rights.

### 3. Witnesses

Prisoners have the right to call witnesses during disciplinary hearings so long as calling those witnesses to testify would not be "unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566; *see also Holland v. Goord*, 758 F.3d 215, 224-25 (2d Cir. 2014). A disciplinary hearing officer may deny a request for witnesses if they reasonably determine that testimony from such witnesses would be irrelevant or unnecessary. *See Ponte v. Real*, 471 U.S. 491, 496 (1985) (citing *Wolff*, 418 U.S. at 566). If it is determined that witnesses may be properly excluded, then the hearing officer must "explain, in a limited manner, the reason why witnesses were not allowed to testify . . ." *See id.* at 497. Defendants argue that Plaintiff requested witnesses whose testimony would have been irrelevant to the hearing. After reviewing the transcript of the hearing, the Court disagrees with Defendant's assertion.

The transcript contains the record of the exchange between Plaintiff and Defendant Lepkowski regarding the witnesses that Plaintiff intended to call in his defense. ECF No. 45-1, Ex. E. Specifically, Plaintiff requested access to the forty inmates who were referenced in the misbehavior report as having witnessed the incident at issue at the disciplinary hearing. ECF No. 45-1, Ex. E, at 31. First, Plaintiff explained that "they said forty people stopped to watch this fight in this ticket," *id.* at 77, and that he "would like to call those forty inmates." *Id.* at 31. Plaintiff then clarified why he was interested in calling them as witnesses, explaining that they would attest to the fact that he "did not swing first, [he] did not start the fight." *Id.* Plaintiff states that they would challenge other aspects of the accusations, including that

> "two officer's claiming that they had I wouldn't stop that they wrestled me, that they fell on the table and then we fell on the floor. None of which happened, and the forty inmates that seen this can testify that I did not resist when it came to the point where they continued to keep spraying me the way they did."

*Id.* Although Defendant Lepkowski implicitly indicated an understanding of Plaintiff's request [and] agreed to call the witnesses by responding, "OK," *id.*, when the hearing was reconvened after an adjournment, Defendant Lepkowski told Plaintiff "[y]ou're not getting any other witnesses." *Id.* at 72. When Plaintiff inquired as to why he was being denied witnesses, Defendant Lepkowski responded "I [am] not deny[ing] you witnesses." *Id.* at 77. Plaintiff persisted in his quest to understand until Defendant Lepkowski finally explained that he denied him witnesses because he "was trying to go a whole different way with this." *Id.* at 82. By this explanation, Defendant Lepkowski implied that he believed the witnesses were irrelevant. Indeed, Defendants explicitly make this argument in their motion papers, arguing that Plaintiff "wanted to question witnesses regarding his claims that corrections officers assaulted him." ECF No. 45-3 at 11. While there are some moments during the hearing that demonstrate Plaintiff intended to put forth arguments about the alleged use of excessive force in B-Mess Hall, those arguments were

16

never in relation to these witnesses. For example, Plaintiff insisted on having a copy of the video in B-Mess Hall because, according to Plaintiff, the video would have shown the corrections officers assaulting him. Nowhere in the transcript did Plaintiff ever allege that the witnesses referenced in the misbehavior report were going to testify about the alleged use of excessive force. Defendant's argument that Plaintiff's witnesses were irrelevant is, therefore, unsupported by the record.

The fact that Plaintiff was allowed to question Barber, the other inmate involved in the fight, does not compel a different result. Plaintiff's principal defense was that he did not start the fight. Barber could not reasonably be expected to testify honestly that he, rather than Plaintiff, started the fight. As a participant in the fight, who was also subject to a disciplinary hearing of his own, he would have had an interest in diminishing his own role in the fight, including whether he started it. Therefore, Plaintiff would have needed the testimony from the other inmates who were not fighting, but only observing, to support his defense.

Defendants further argue that the failure to call the other witnesses is harmless because he pled guilty to the fighting charge. ECF No. 45-3 at 18. Defendants assert that it was reasonable to find him guilty on the other charges merely on the basis of pleading guilty to fighting because "Fighting is 'violent conduct', which 'creates a disturbance', and force is only used after an inmate 'refuses a direct order' to stop fighting." *Id.* However, if the fight took place as Plaintiff alleged, Plaintiff did not start the fight and so less likely to be found responsible for *creating* the disturbance. Moreover, if Plaintiff was indeed defending himself against Barber's aggression, his conduct might not have been found to rise to the level of violent conduct. Finally, since the allegation in the misbehavior report that the officers had to tackle Plaintiff in order to stop the fight

provided the basis for finding Plaintiff guilty of refusing a direct order, testimony to the contrary would undermine that conclusion, making such testimony relevant.

In light of the foregoing, the witnesses Plaintiff intended to call, if permitted to testify, could have served as the basis to find him "not guilty" of violent conduct, creating a disturbance and refusing a direct order, and mitigated his guilt on the fighting charge, paving the way to a lesser penalty that might not have deprived him of a liberty interest. The absence of testimony from these witnesses, therefore, is not harmless.

Viewing this evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendant Lepkowski's decision to exclude the requested witness testimony was not because such witness testimony would be "unduly hazardous to institutional safety or correctional goals," *Wolff*, 418 U.S. at 566, or irrelevant. *Ponte*, 471 U.S. at 496. Accordingly, Defendants are not entitled to summary judgment with respect to Plaintiff's due process claim arising out of Defendant Lepkowski's failure to permit certain witnesses to testify.

Having reached this result, Defendants argue in the alternative that Defendant Lepkowski is entitled to qualified immunity on this claim "because it was reasonable for him to believe that he could validly do so on the ground that the testimony of the witnesses in question was unlikely to be relevant or probative." ECF No. 45-3 at 23. The Court disagrees.

"The doctrine of qualified immunity shields government officials from liability for damages resulting from the performance of discretionary official functions if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Turner v. Grant*, No. 98–CV–706, 2000 WL 362032, at *6 (W.D.N.Y. March 29, 2000) (*quoting Ayers v. Ryan*, 152 F.3d 77, 82 (2d Cir. 1998)). Summary judgment may be granted on this ground if the defendant can show that the asserted right was not clearly established at the

time of the relevant events, or that it was nonetheless objectively reasonable for the official to believe that his conduct did not violate the asserted right. *See Rodriguez v. Phillips*, 66 F.3d 470, 475 (2d Cir. 1995).

Defendants concede that the law was clearly established that Plaintiff had the right to call witnesses at his disciplinary hearing under certain circumstances. ECF No. 45-3 at 23. However, Defendants argue that, under the circumstances of this hearing, it was objectively reasonable for Defendant Lepkowski to deny Plaintiff of this right because he thought that the witnesses were not relevant. *Id.* Defendants argument does not withstand scrutiny.

As discussed above, Plaintiff requested witnesses who were present during the fighting incident and who he expected to testify that he did not start the fight and that he did not resist in the manner described in the misbehavior report. *See* ECF No. 45-1, Ex. E, at 31, 77. Since Defendant Lepkowski relied on the facts alleged in the misbehavior report to find Plaintiff guilty and Plaintiff intended to offer testify contradicting those facts, this testimony was objectively relevant. Plaintiff never indicated that he intended to use these witnesses for any other purpose, so Defendant Lepkowski's belief to the contrary is unsupported by the record. In the absence of record evidence to support Defendant Lepkowski's purported reason for excluding the witnesses, his exclusion of witnesses was not objectively reasonable and, therefore, he is not entitled to qualified immunity at this stage for denying Plaintiff of his right to call these witnesses in his defense.

### 4. Impartial Hearing Officer

Plaintiff has alleged that his disciplinary hearing also violated his right to procedural due process because Defendant Lepkowski was not impartial. Defendants argue that Plaintiff has not met the standard for showing that Defendant Lepkowski was impartial, and therefore, they are entitled to summary judgment on this claim. The Court disagrees.

The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to . . . an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (*citing Wolff*, 418 U.S. at 570-71). An impartial hearing officer is "one who, *inter alia*, does not prejudge evidence and who cannot say . . . how he would assess the evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 569–70 (2d Cir. 1990). "When a hearing officer states that he will not even consider evidence that a prisoner has introduced . . . the hearing officer may be biased." *Rahman v. Acevedo*, No. 08 CIV. 4368, 2011 WL 6028212, at *7 (S.D.N.Y. Dec. 5, 2011).

In *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995), *overruled on other grounds*, *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit dealt with the issue of a biased hearing officer. There, the inmate had alleged that his hearing officer was not open to considering his version of events in question and as a result refused to consider evidence in support of the inmate's version of events. *Id.* at 871. Because the hearing officer refused to consider evidence supporting his principal defense, the Second Circuit ruled that an issue of fact had been created as to whether the hearing officer was biased. *Id.*

Plaintiff makes similar arguments in this case. Plaintiff argues that Defendant Lepkowski was biased because he refused to consider certain evidence in support of his principal defense, principally that he did not start the fight and that he did not resist to the extent alleged in the misbehavior report. In light of the fact that Defendant Lepkowski refused to consider testimony from certain witnesses without any apparent basis to do so in the record and that these witnesses were expected to testify in support of Plaintiff's version of events in question, the Court finds that an issue of fact exists as to whether Defendant Lepkowski's decision to exclude these witnesses caused by bias and a predetermination of Plaintiff's guilt. Accordingly, Defendants are not entitled

to summary judgment on Plaintiff's due process claim that Defendant Lepkowski was not impartial.

### 5. Documentary Evidence

Plaintiff alleges that his request for several documents and video evidence relevant to his defense was denied. ECF No. 50 at 4-5. The documents Plaintiff requested include a medical log ECF No. 45-1, Ex. E at 36, the use of force report and the unusual incident report, *id.*, the video of B-side mess hall, and written statements by the officers, *id.* at 43. Defendants argue that Plaintiff either received documents that he claims not to have received or that such documents were irrelevant.

Plaintiff demanded contemporary written statements from the witnessing and participating officers about the incident, but the record also shows that there are no contemporary written statements from the officers other than the misbehavior report, the use of force report and the unusual incident report. *Id.* at 43. Respecting the unusual incident report and the use of force report, the record shows that Plaintiff received copies of both prior to the hearing and was permitted to review an unredacted copy of the unusual incident report during the hearing. *See id.* at 22, 25, 27. Plaintiff did not receive any other contemporary written statements by the responding officers because there were none. Defendants cannot be held responsible for failing to provide documents that do not exist, and no reasonable juror could conclude otherwise.

Respecting the medical log, Defendants contend that this was irrelevant to the proceedings and the Court agrees. The medical log only contains information about Plaintiff's health and his medical treatment and would not contain any information that supports Plaintiff's asserted defenses to the charges. Its irrelevance is further buttressed by Plaintiff's stated purpose to use it

to advance his allegation that the prison staff never gave him a shower after spraying him with pepper spray. *Id.* at 45.

The Court disagrees, however, that the video evidence was irrelevant. Plaintiff requested video from the B-side Mess Hall from 1:50 pm until 2:50pm. ECF No. 45-1, Ex. E at 13. Defendants do not dispute that Defendant Lepkowski did not give Plaintiff that video evidence. ECF No. 45-1 at ¶ 21. Defendants instead argue that the video was denied because it was irrelevant, and it was irrelevant because the video only contained potential evidence of Plaintiff's allegations of being assaulted by the corrections officers after the fight. *Id.* at ¶ 20.

Although a prison disciplinary proceeding is not held to the same standard as a court proceeding, the Federal Rules of Evidence are instructive in the determination of whether the video evidence was relevant to Plaintiff's defense. Under the Federal Rules, evidence is relevant when it has any tendency to make the existence of any fact that is of consequence to the determination more or less probable than it would be without the evidence. Fed. R. Evid. 402. There were several facts at issue in Plaintiff's disciplinary proceeding, including whether the responding corrections officers used force against Plaintiff as a necessary means stop his fight with Barber. Indeed, Defendant Lepkowski wrote in his hearing decision that, in finding Plaintiff guilty of refusing a direct order, he relied on the misbehavior report which alleged that CO Mathewson "gave several direct orders to stop," but that the "fight[ing] continued until . . . force was used." ECF No. 45-1, Ex. F at 248. Plaintiff testified, on the other hand, that "they sprayed us while we was on the floor, hand cuffed us while we was on the floor, then picked us up. There was no struggling involved with the police, nothin." *Id.*, Ex. E at 53. He goes on to say that after the fight ended without struggle, "they took me out into the kitchen, away from the other inmates, I'm pretty sure some of them came to the door to watch. And they picked me up and body slammed me to the floor." *Id.*

A video of what happened in the B-side Mess Hall would shed some light on which version of events was to be believed, directly bearing on the question of whether Plaintiff, in fact, refused a direct order.

Viewing this evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that his due process right to present relevant evidence in his disciplinary proceeding was violated by the refusal to provide him with video evidence of the B-side Mess Hall.

### 6. Prejudice

In the event the Court finds that Plaintiff's procedural due process rights have been violated, Defendants argue that they are still entitled to summary judgment because Plaintiff cannot show that he was prejudiced by any of the procedural errors. ECF No. 45-3 at 12-13.

"To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." *Clark v. Dannheim*, 590 F. Supp. 2d 426, 429 (W.D.N.Y. 2008). In *Clark*, the court explained that even where the plaintiff showed that he was entitled to certain medical records in support of his defense, he could not show that he was prejudiced by their absence because the "principal issue was who threw the first punch" and those records would not have helped in making that determination. *Id.*

Here, the Court has determined that Plaintiff has produced sufficient evidence to create a genuine dispute of material fact that his due process rights were violated by (1) removing him from the hearing, (2) inadequate employee assistance, (3) denying him certain witnesses, and (4) the lack of an impartial hearing officer. The Court has already determined that the lack of adequate employee assistance was harmless because the hearing officer stepped in to assist. The Court also concludes that Plaintiff was not prejudiced by his removal from the hearing because, prior to his

removal, Plaintiff exhausted all the possible objections and requests he could have made respecting witnesses, documentary evidence and other procedural issues. Plaintiff does not allege that there are any other arguments he intended to make, but was prevented from making, by virtue of his removal.

However, the Court finds that the failure of the hearing officer to be impartial and the denial of witnesses did, in fact, prejudice Plaintiff. The exclusion of the witnesses prejudiced Plaintiff because, unlike *Clark*, their testimony would have been directly relevant to Plaintiff's principal defense, which is that he did not start the fight and that many other facts asserted in the misbehavior report did not actually happen as recounted. Moreover, since the record suggests that the hearing officer's bias contributed to his decision to exclude those witnesses, and the exclusion of witnesses was prejudicial, then the hearing officer's bias was also prejudicial as its. Accordingly, Defendants are not entitled to summary judgment on the basis that the procedural errors were not prejudicial.

## II.   Exhaustion

Defendants move for summary judgment on Plaintiff's remaining claims on the basis that he failed to exhaust those claims via available administrative procedures. ECF No. 45-3 at 28. The Court agrees.

The Prison Litigation Reform Act ("PLRA"), provides that "[n]o action shall be brought with respect to prison conditions under [§ 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Johnson v. Rowley*, 569 F.3d 40, 45 (2d Cir. 2009).

To determine whether a prisoner has exhausted his remedies, the court must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009). Where the prison's procedures permit appeal of an adverse ruling, to exhaust the available procedures a prisoner must file an appeal. Further, "proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules" as a precondition to filing a federal lawsuit "because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

In New York, inmates are provided an opportunity to administratively challenge conditions of their confinement through a three-step process outlined in the Inmate Grievance Program ("IGP"). *See* 7 N.Y.C.R.R. § 701.5. First, the inmate must file a complaint with the Inmate Grievance Resolution Committee ("IGRC"). The IGRC will then issue a decision on the grievance. *Id.* § 701.5(a)-(b). The inmate may appeal the decision to the superintendent by completing the appeal section of the IGRC response form. *Id.* § 701.5(c). Finally, the inmate may appeal the superintendent's decision to the Central Office Review Committee ("CORC") by submitting the appropriate form to the grievance clerk within seven calendar days of the superintendent's response. *Id.* § 701.5(d)(1).

An "expedited procedure for the review of grievances alleging harassment" bypasses the first step of the IGP, sending the grievance directly to the superintendent for review. *See id.* at § 701.8. If the superintendent fails to respond to the grievance within twenty-five calendar days, or the grievant otherwise wishes to appeal the superintendent's response, an appeal may be made to the CORC within seven calendar days. *Id.* § 701.8(h). Plaintiff failed to exhaust his administrative remedies because he failed to timely appeal to the CORC.

### A. First Grievance – FPT-0003-20

On February 2, 2020, Plaintiff filed an initial grievance alleging excessive force, failure to intervene, and deliberate indifference to the chemical agent on his skin that was causing a burning sensation. ECF No. 6 at 40. It was received by the IGRC on February 5, 2020, and because it met the criteria for a harassment grievance, was immediately forwarded to the superintendent for investigation. *Id.* Pursuant to 7 N.Y.C.R.R. § 701.8(f), the superintendent had twenty-five days to respond to Plaintiff's grievance, or until February 27, 2020, unless Plaintiff granted an extension to the deadline in writing. Plaintiff says that he did not grant an extension and Defendants do not claim otherwise, ECF No. 6 at 28, so the superintendent had until February 27, 2020 to respond. The superintendent did not respond by the statutory deadline, in fact, the superintendent's response is dated as of March 19, 2020, more than forty-four days after the superintendent initially received Plaintiff's grievance, and Plaintiff says that he did not receive it until March 27, 2020, which is fifty-two days after the superintendent received the grievance.

Because the superintendent responded late, Plaintiff could have appealed the superintendent's non-response. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("matters not decided within the time limits may be appealed to the next step."). Such an appeal must be filed within seven calendar days of the superintendent's twenty-five-day response deadline, which would have been March 5, 2020—seven days after the February 27th deadline. *See* 7 N.Y.C.R.R. § 701.5(d)(1). However, Plaintiff did not file an appeal of the superintendent's non-response until March 26, 2020, which made his appeal twenty-one days late. ECF No. 6 at 21.

Plaintiff also had the option of appealing the superintendent's actual response from the day he received it on March 27, 2020, which would have been April 3, 2020. *See* 7 N.Y.C.R.R. § 701.5(d)(1). Except in appealing the superintendent's actual response, Plaintiff was required to

complete and sign Form #2133. Even though Plaintiff's attempt to appeal the superintendent's non-response on March 26, 2020 preceded the April 3rd deadline, Plaintiff's appeal on March 26th was simply a letter and not the completed Form #2133, so his March 26th appeal could not constitute an appeal of the superintendent's actual response, only the late appeal of the non-response.

The regulations permit an incarcerated individual to request an exception to the appeal time limit. *See* 7 N.Y.C.R.R. § 701.6(g)(1). The IGP supervisor may grant such a request "based on mitigating circumstances," but may not extend the appeal deadline if the request is made "more than forty-five days after the date of the decision unless the late appeal asserts a failure to implement the decision." *Id.* at § 701.6(g)(1)(i)(b). In other words, since the superintendent's decision is dated March 19, 2020, Plaintiff could have could have requested an extension to the appeal deadline through May 3, 2020.

When Plaintiff sent his appeal to the IGRC Clerk at Five Points on March 26, 2020, he did not request an extension. ECF No. 6 at 21-22. Rather, Plaintiff merely asserted that he was exercising his right to appeal the superintendent's non-response. *Id.* The clerk did not file his appeal because it was late. *Id.*at 36. Even if Plaintiff had requested an extension, Plaintiff did not allege any mitigating circumstances to excuse his delay. *Id.* In any case, it would be difficult to imagine what mitigating circumstances plaintiff could have alleged since Plaintiff did not acknowledge any awareness that his appeal was late. *See* ECF No. 6 at 22 ("I am exercising my right . . . to appeal to the next stage.").

Plaintiff had two opportunities to appeal his grievance, but he missed the deadline on both occasion and did not follow the proper procedure. Plaintiff could have also asked for an extension, but he failed to do so. Plaintiff had every available administrative remedy to appeal his grievance

regarding his allegations of excessive force, failure to intervene and deliberate indifference, but Plaintiff failed to do so. Accordingly, Plaintiff has not exhausted his administrative remedies and his claims of excessive force, failure to intervene and deliberate indifference to the burning sensation on his skin are barred from being brought in federal court. *See Johnson*, 569 F.3d at 45 ("[U]nexhausted claims cannot be brought in court.").

## B. Second Grievance – FTP-0135-20

Plaintiff's second grievance contains his allegations of deliberate indifference against Defendant Stanton. In it, Plaintiff alleges that, while held in SHU, he suffered from excruciating pain as a result of the injuries he sustained from the alleged beating he endured by certain corrections officers and that Defendant Stanton deliberately ignored his pain and would not give him the medical care he thought that he needed. ECF No. 6 at 47. The injuries alleged included a concussion, burning skin from the chemical agent that was sprayed, bruised ribs and wrists, broken cartilage in his right shoulder, and an eye that was swollen shut. *Id.* Plaintiff filed this grievance on February 6, 2020. On February 11, 2020, Plaintiff also wrote to the superintendent to complain about his difficulty obtaining medical treatment from Defendant Stanton. *Id.* at 49. The superintendent never responded to the grievance nor to his subsequent letter. After not hearing from the superintendent regarding this second grievance within twenty-five days, it was Plaintiff's right to appeal the superintendent's non-response within seven days. *See* 7 N.Y.C.R.R. §§ 701.5(d)(1) and 701.6(g)(2). However, the record contains no evidence, and Plaintiff does not allege, that Plaintiff ever appealed, or attempted to appeal, the superintendent's non-response. Because Plaintiff never appealed the superintendent's non-response to his second grievance, Plaintiff failed to exhaust his administrative remedies with respect to the claim contained therein

and is, therefore, barred from bringing that claim in federal court. *See Johnson*, 569 F.3d at 45 ("[U]nexhausted claims cannot be brought in court.").

Because Plaintiff failed to exhaust his administrative remedies respecting his claims of excessive force, failure to intervene and deliberate indifference, Defendants are entitled to summary judgment on these claims as a matter of law.

## CONCLUSION

Defendants' motion for summary judgment is DENIED with respect to Plaintiff's due process claim against Defendant Lepkowski arising out of (1) the exclusion of certain witnesses, (2) the exclusion of video evidence, and (3) his alleged bias as the hearing officer. Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's due process claim against Defendants Courtwright and Lepkowski arising out of (1) his removal from the first hearing, (2) his removal from the second hearing, (3) inadequate employee assistance, and (4) failure to provide him with certain documentary evidence as detailed. Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's claims of excessive force, deliberate indifference, and failure to intervene against Defendants Confer, McCormick, Masocco, Stanton, Mathewson, and McCarrick. Plaintiff's action against Defendant Lepkowski may continue. All other Defendants are hereby DISMISSED from the action. The Clerk of Court is respectfully directed to update the case caption accordingly.

IT IS SO ORDERED.

Dated: March 11, 2024
        Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York

29